UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-61510-CIV-COHN/SELTZER

JAMES A. ONEAL and LINDA ONEAL,

    Plaintiffs,

v.

ALFA LAVAL, INC., et al.,

    Defendants.
_____/

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Foster Wheeler Energy Corporation's Motion for Summary Judgment [DE 153] and Defendant Crane Co.'s Motion for Summary Judgment [DE 154] (together, "Motions"). The Court has carefully reviewed the Motions and all related filings and is otherwise advised in the premises.[1]

**I.   Background**

    **A.   Material Facts**[2]

---

[1] Also pending are several Motions in Limine, filed by Defendants Crane Co. ("Crane") and Foster Wheeler Energy Corporation ("Foster Wheeler"), regarding the admission of certain evidence and arguments at trial. See DE 190–193, 199–204, 206. As discussed further herein, the Court concludes that Foster Wheeler's Motion for Summary Judgment should be granted. Thus, the Motions in Limine filed solely by Foster Wheeler will be denied as moot. See DE 199–201. And though Plaintiffs and Crane have requested a hearing on the Motions for Summary Judgment, see DE 163, 172, the Court finds that the determinative facts and legal issues are fully developed in the written record. Accordingly, the requests for hearing will be denied.

[2] In support of their Responses to Defendants' Motions for Summary Judgment, Plaintiffs have filed two "Statements of Disputed Facts." DE 158 at 1; DE 160 at 1. Each Statement totals one page and lumps together, in a single paragraph, Plaintiffs' "Responses" to Defendants' Statements of Facts. See DE 158 at 1 ("Response to Statement Nos. 1–17" of Crane); DE 160 at 1 ("Response to Statement Nos. 1–41" of Foster Wheeler); see also S.D. Fla. L.R. 56.1(a) ("Statements of material facts

Plaintiff James A. Oneal served in the United States Navy for about twenty years between June 7, 1958, and March 30, 1980. See DE 152 (Statement of Material Facts in Supp. of Def. Foster Wheeler Energy Corp.'s Mot. for Summ. J.) at 1-8. During his naval career, Oneal worked aboard several different vessels, mainly in the boiler rooms (or "fire" rooms). See id.; DE 154 at 3-4, ¶ 7 (Statement of Undisputed Facts Contained in Def. Crane Co.'s Mot. for Summ. J.). His work mainly involved servicing equipment associated with the boilers, including steam pipes, valves, gaskets, pumps, and doors. See DE 152 at 1-8. Much of this work included removing and replacing packing or insulation materials that contained asbestos. See id. Further, while serving on repair ships, Oneal boarded other ships to work on their boilers. See id. at 6, ¶¶ 22-24; id. at 7-8, ¶¶ 30-32. Later in his career, Oneal also supervised other sailors performing these tasks, coordinated repair projects, and conducted quality-control inspections of boilers. See id. at 7, ¶ 58; id. at 8, ¶¶ 31, 34.

### 1. Foster Wheeler Products

At his deposition, Oneal testified that he worked aboard several ships that used boilers manufactured by Defendant Foster Wheeler:

- USS *Platte* from about 1960 to 1961 (see DE 152 at 2-3, ¶¶ 5-7);

- USS *Francis Marion* from 1970 to 1972 (see id. at 5, ¶¶ 17-18);

---

submitted in opposition to a motion for summary judgment shall correspond with the order and with the paragraph numbering scheme used by the movant[.]"). Plaintiffs' Statements also fail to cite any specific record evidence; they instead rely on identical boilerplate objections that are essentially meaningless. See DE 158 at 1; DE 160 at 1; see also S.D. Fla. L.R. 56.1(a)(2) (requiring that statements of material facts opposing summary judgment be "supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court"). Thus, the material facts recited by Defendants and supported by the record are deemed admitted. See S.D. Fla. L.R. 56.1(b).

- unidentified vessels that Oneal helped tend while serving on a repair ship (USS *Prairie*) from 1972 to 1974 (see id. at 6, ¶¶ 22-24);

- various ships at the Navy Development and Training Center from January 1974 to April 1976 (see id. at 6-7, ¶¶ 25-26);

- USS *Vega* from April 1976 to April 1977 (see id. at 7, ¶¶ 27-29); and

- USS *Jason*, as well as unidentified ships that the *Jason* serviced, from May 1977 to March 1979 (see id. at 7-8, ¶¶ 30-32).

Oneal, however, did not serve on any of these vessels when they were first launched. All the ships had been in service for years before he worked on them. See DE 152-1 (Videotaped Dep. of James A. Oneal, Vol. I) at 70-71; see also DE 152-5 (Dep. of Lawrence Stilwell Betts, MD, Ex. 1) at 161-62.

When the ships were constructed, Foster Wheeler delivered its boilers to naval shipbuilders without any exterior thermal insulation. See DE 152 at 9, ¶ 37. The shipbuilders, not Foster Wheeler, supplied and installed the external insulation on the boilers in accordance with naval military and contract specifications. See id. Also, the fire bricks and insulating bricks inside the boilers' furnaces did not contain asbestos. See id. And no asbestos was connected with the bare metal tubes inside the Foster Wheeler boilers on any of the vessels Oneal served aboard. See id. Nor did Foster Wheeler supply any spare or replacement insulation, fire brick, or insulating brick for any of the ships on which Oneal worked. See id.

Some of the ships Oneal served aboard had Foster Wheeler boilers that contained internal asbestos-containing gaskets and packing when the ships were built. See DE 152 at 9-10, ¶ 39. But those original parts had been replaced long before Oneal came onboard the ships. See id. at 10, ¶ 39. Any spare parts furnished by

Foster Wheeler during the shipyard's initial installation of the boilers would have been consumed within the first year or two of the ships' operation.  See id.

For eight of the nine ships Oneal worked on during his career, Foster Wheeler did not supply any asbestos-containing replacement parts after the installation of the boilers and before or during Oneal's service.  See DE 152 at 10, ¶ 40.  On one ship, USS *McKean*, Foster Wheeler did provide asbestos-containing copper-jacketed gaskets for the steam drum at least five years before Oneal boarded the ship.  See id.; DE 154 at 3, ¶ 7.  Oneal, though, did not testify that he or anyone else worked on the steam drum.  See DE 152 at 10, ¶ 40.  In any event, these gaskets would have been consumed within two years after being supplied to the Navy, well before Oneal boarded the *McKean*.  See id.[3]

### 2. Crane Products

The only products manufactured or supplied by Defendant Crane that Oneal recalls working with or around are Crane valves and "Cranite" brand gaskets.  See DE 154 at 3, ¶ 4.  Oneal testified that he worked on valves throughout his naval career, including replacing packing and flange gaskets and installing new valves.  See id. at 3, ¶ 5.  He identified three brands of valves, Crane among them.  See id.  Yet when asked about any distinguishing features of Crane valves, Oneal stated, "I can't — I can't remember.  There was — a lot of them — a lot of valves . . . .  But I can't remember whether it's Crane or some other one."  DE 152-2 (Videotaped Dep. of James A. Oneal, Vol. II) at 147.

---

[3] Oneal had no knowledge about the maintenance or repair history of any of the ships he served on, including when and how many times the consumable asbestos was replaced before he came aboard the ships.  See DE 152 at 10, ¶ 41.

4

Assuming that Oneal worked on Crane valves, the only potential asbestos-containing materials he would have encountered were packing and gasket sealing products. See DE 154 at 3, ¶ 6. When Crane delivered certain valves to the Navy, they may have had a gasket or piece of packing installed in them. See id. at 4, ¶ 7. Though some of these internal parts might have contained asbestos, the parts wore out over time and had to be replaced. See id. And there is no evidence that these Crane products remained in any valves when Oneal worked on them. See id.; see also id. at 5, ¶ 11 (discussing testimony of Crane's expert naval historian that none of Crane's original packing or gasket materials would have remained when Oneal served aboard the ships). In this regard, Oneal could not identify Crane as having made or supplied any packing or gaskets that he may have removed from a Crane valve. See DE 154 at 4, ¶ 7.

Oneal specifically identified "Cranite" as a sheet gasket material he worked with in the Navy. See DE 152-1 at 25, 29-30; DE 152-2 at 140. According to Oneal, he changed the Cranite material "all the time." DE 152-1 at 29. As a result of this work, Oneal claims, "there was dust flying everywhere," and he breathed in that dust. Id. Oneal recalls working with Cranite on every ship he served aboard; he "was always there with it." DE 152-2 at 165.

Crane, by contrast, offers testimony that it was never a qualified supplier of replacement sheet gaskets to the Navy. See DE 154 at 5, ¶ 9. Crane's expert naval historian, Thomas F. McCaffery, declares that "Crane Co. was not and never was an approved manufacturer or supplier of thermal insulation, packing or gasket products that were used by the U.S. Navy either in or on the machinery or valves they sold to the U.S. Navy." DE 154-4 at 10. McCaffery further explains that "if compressed asbestos

sheet was required by the valve specification, the only products that could have been used for gaskets in these valves were those listed on the Qualified Product List for the Specification." Id. at 9; see also DE 154-5 (Report of Rear Admiral (Ret.) David P. Sargent, Jr.) at 25-26 (describing rigorous approval process for materials on Qualified Product List).

Plaintiffs' expert witness, Captain William A. Lowell, testified that it was at least possible for materials not on the Qualified Product List to end up on a Navy ship. See DE 159-2 (Dep. of Captain William A. Lowell) at 22, p. 80. But Lowell added that if a supplier "got caught" providing such materials, "there would be a hell of a problem." Id. More, Lowell confirmed that during his own naval career, he had no recollection of seeing Cranite gaskets. See id. at 26, p.137.[4]

### B.   Procedural History

In 2010, Oneal was diagnosed with mesothelioma.[5] See DE 152 at 9, ¶ 26. Oneal and his wife Linda ("Plaintiffs") filed this case in state court on May 29, 2013. See DE 3-1 (Crane Co.'s Notice of Removal) at 2, ¶ 1. On July 12, 2013, Crane removed the action to this Court based on a statute allowing review of claims against persons acting at the direction of federal officers. See DE 3-1; 28 U.S.C. § 1442(a)(1). Foster Wheeler later joined in Crane's Notice of Removal. See DE 42.

---

[4] Oneal also testified that during his service in the Navy, he worked with "Crane" rope packing material in connection with valves and boilers. See DE 154 at 6, ¶ 15. It is undisputed, however, that Crane never manufactured or supplied this material. See id. The rope packing was made by another firm—Crane Packing Company—that has no relation to Crane Co. See id. at 7, ¶ 15.

[5] Mesothelioma is "a fatal cancer of the lining of the lung caused by asbestos exposure." Faddish v. Buffalo Pumps, 881 F. Supp. 2d 1361, 1365 (S.D. Fla. 2012).

6

Plaintiffs' current Amended Complaint asserts claims against Crane, Foster Wheeler, and several other makers of asbestos-containing products that Oneal was allegedly exposed to while working in the Navy.[6]  See DE 1-2.  Plaintiffs contend that Oneal's mesothelioma was caused by exposure to "the asbestos or asbestos-containing products mined, milled, manufactured, sold, supplied and/or distributed by the Defendants."  Id. at 2, ¶ 4.  The Amended Complaint pleads three counts: negligence, strict liability, and loss of consortium (Linda Oneal only).  See id. at 10-17.  Plaintiffs seek compensatory damages for medical expenses, pain and suffering, and other economic and non-economic injuries.  See id. at 18-19.

In their present Motions, Foster Wheeler and Crane (hereafter, "Defendants") argue that they are entitled to summary judgment on the basis that Oneal was never exposed to any asbestos-containing materials produced or supplied by Defendants.  See DE 153 at 1-2; DE 154 at 1-2.  Plaintiffs have filed Responses opposing the Motions, and Defendants have submitted Replies.  See DE 159, 161, 171, 173.  The parties have also filed extensive documentary evidence in support of their arguments.

**II.      Discussion**

    **A.      Motions for Summary Judgment**

        **1.      Summary Judgment Standards**

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

---

[6] Most, but not all, Defendants besides Crane and Foster Wheeler have been voluntarily dismissed from the case.  See DE 229 (Order Regarding Settling Defs.).

those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must demonstrate that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.

If the movant makes this initial showing, the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577. If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

A court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." Id. at 249.  In so doing, the court must view the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor.  See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The court also must discern what issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

### 2. Choice of Law

Here, the Court must consider whether Oneal's claims are governed by federal admiralty law or by state law.  In general, admiralty law applies to a tort action when the alleged tort occurred on navigable waters and the claimed injury and conduct were significantly related to traditional maritime activities.  See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995) (discussing "location" and "connection" tests for admiralty jurisdiction).  In this case, Oneal's alleged asbestos exposure occurred almost entirely at sea during his service aboard naval vessels. The Court therefore concludes that federal admiralty law applies to Plaintiffs' claims. See Faddish v. Buffalo Pumps, 881 F. Supp. 2d 1361, 1367-68 (S.D. Fla. 2012) (holding that plaintiff's claimed exposure to defendants' asbestos products aboard naval vessel warranted application of maritime law).  Still, "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co., 207 F.3d 1247, 1251 (11th Cir. 2000) (per curiam).  Therefore, the Court will also consider the substantive law of Florida—the only state having any apparent

9

connection with the case—to the extent it is consistent with maritime law.  See Faddish, 881 F. Supp. 2d at 1368.

### 3. Foster Wheeler's Motion

Based on the material facts established in Part I.A.1 above, no substantial evidence demonstrates that Oneal was exposed to Foster Wheeler asbestos products on any Navy ship he served aboard.  Foster Wheeler supplied its boilers to naval shipbuilders with no exterior insulation, and most of the internal components lacked any asbestos.  Although Foster Wheeler originally supplied some boilers with asbestos-containing gaskets and packing, those parts had been consumed and replaced long before Oneal worked on the ships.  Nor does any evidence show that Foster Wheeler supplied replacement asbestos products to which Oneal could have been exposed.  Accordingly, the record does not present a triable issue of fact about whether Oneal was exposed to asbestos produced or supplied by Foster Wheeler.

Plaintiffs argue that Foster Wheeler may still be held liable because it could have foreseen that the Navy would, or might, use asbestos products in Foster Wheeler's boilers.  In this respect, Plaintiffs argue that the Court should not apply the so-called "bare metal defense"—the rule that a manufacturer of bare metal products cannot be held responsible for other manufacturers' asbestos-containing materials used in connection with the bare metal.  See Morgan v. Bill Vann Co., 969 F. Supp. 2d 1358, 1364 (S.D. Ala. 2013).  As Judge Hurley explained in Faddish, the bare metal defense "posits that a manufacturer has no duty to warn about hazards associated with a product it did not manufacture or distribute."  881 F. Supp. 2d at 1368.  While some courts have declined to adopt this rule, it nonetheless reflects the clear majority view.  See, e.g., Lindstrom v. A–C Prod. Liab. Trust, 424 F.3d 488, 497 (6th Cir. 2005)

(emphasizing that a defendant "cannot be held responsible for asbestos containing material that . . . was incorporated into its product post-manufacture"); Cabasug v. Crane Co., 989 F. Supp. 2d 1027, 1041 (D. Haw. 2013) (concluding that "under maritime law, a manufacturer is not liable for replacement parts that it did not place into the stream of commerce, whether the manufacturer's product originally contained asbestos components or was designed to include asbestos components"); Faddish, 881 F. Supp. 2d at 1368 (interpreting Florida law to provide that "a manufacturer's duty to warn, whether premised in negligence or strict liability theory, generally does not extend to hazards arising exclusively from other manufacturer's products, regardless of the foreseeability of the combined use and attendant risk"); Conner v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012) (holding that "under maritime law, a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute").

This Court likewise is persuaded that the maker of a product that contains no asbestos may not be held liable for injuries caused by asbestos that others supply or use in connection with the product. As Judge Hurley aptly observed,

> In the products liability arena, the lines of liability are more narrowly drawn. Regardless of the foreseeability risk, here the duty to act is limited to entities within a product's chain of distribution on theory that these are the entities best motivated and capable of controlling the risk.

Faddish, 881 F. Supp. 2d at 1372; see Conner, 842 F. Supp. 2d at 800-01 ("[P]roducts-liability theories rely on the principle that a party in the chain of distribution of a harm-causing product should be liable because that party is in the best position to absorb the costs of liability into the cost of production[.]" (citing Restatement (Second) of Torts § 402A, cmt. c (1965))). For these reasons, Plaintiffs cannot hold Foster

11

Wheeler legally responsible for Oneal's exposure to other manufacturers' asbestos products that may have been used in Foster Wheeler's boilers. The Court will therefore grant Foster Wheeler's Motion for Summary Judgment.[7]

### 4.  Crane's Motion

The Court's analysis involving Foster Wheeler's boilers applies equally to the Crane valves that Oneal allegedly serviced aboard naval vessels. As detailed above in Part I.A.2, even if Oneal can show that he worked on Crane valves, he provides no substantial evidence that he was exposed to any asbestos-containing products that Crane made or supplied. Certain valves that Crane delivered to the Navy may have included gaskets or packing containing asbestos. But as with the similar Foster Wheeler products, these original parts wore out and were replaced before Oneal was ever near the valves. And Oneal has not identified Crane as the maker or supplier of the parts. More, the bare metal defense forecloses Plaintiffs' argument that Crane is liable because other companies provided asbestos-containing materials for the valves.[8] Crane's Motion for Summary Judgment will therefore be granted with respect to Oneal's alleged exposure to asbestos from Crane valves.

The Court reaches a different conclusion, however, regarding the Cranite sheet gasket material. Oneal gave detailed testimony about his alleged work with Cranite:

- "[T]he Crane packing is called Cranite. We used to remember that because you'd think of Superman and kryptonite. And kryptonite was supposed to be strong enough to kill Superman, so this Cranite was supposed to stop the steam coming out of it. So we remembered it that way." (DE 152-1 at 25);

---

[7] The Court has considered Plaintiffs' other arguments opposing Foster Wheeler's Motion, but finds that they lack merit and do not warrant separate discussion.

[8] Again, to the extent Plaintiffs argue that the bare metal defense is inapplicable here, the Court finds those arguments unavailing.

12

- "[T]hat Cranite gasket was — it come in sheets like — and you — if you have to replace a gasket in a steam line — of course, you didn't have the steam in the line. You had to wait until the steam was out. And you would take it apart, and you scraped the old gasket off. And then you put this gasket material up against the flange. And you take a ball pein hammer and cut it out. And then where all your bolt holes go through, you knock it out. And then where the inside of the pipe, you knock that part out, so . . . And then there was dust flying everywhere then. (Id. at 29);

- Oneal "breathe[d] that dust," and "[w]e changed [the Cranite] all the time." (Id.);

- The Cranite "was a beige or yellow color, and it had Cranite written on it in red. We called it the red eye." (Id. at 30);

- The name "Cranite" was stamped on the sheet gasket material "in rows down it, 'Cranite, Cranite.'" (DE 152-2 at 140); and

- There were no ships on which Oneal did not recall working with Cranite gaskets, and he never stopped "working hands on" with that material. He "was always there with it." (Id. at 165)

Crane asks the Court to disregard this testimony, claiming that it is "inherently incredible" given the other evidence of record. DE 154 at 2. Specifically, Crane emphasizes the testimony of its naval-history expert that Crane was never a qualified supplier of replacement sheet gaskets to the Navy, so Cranite could not have been used on the ships Oneal served aboard. See DE 154 at 5, ¶ 9; DE 154-4 at 9-10. Certain testimony from Plaintiffs' own expert likewise casts doubt on whether Cranite was present on Navy vessels. See DE 159-2 at 22, p. 80; id. at 26, p.137. In the alternative, Crane asserts that "any exposure to Cranite gaskets is minimal at best and does not qualify as a substantial contributing cause to the development of Mr. Oneal's mesothelioma." DE 154 at 13.

Viewed in the light most favorable to Plaintiffs, however, the record creates a genuine dispute of material fact about whether Oneal was substantially exposed to

13

Cranite during his naval service. Oneal testified in detail about working closely and often with Cranite throughout his career. And according to Plaintiffs' expert, it was at least possible for non-qualified products (like Cranite apparently was) to end up on a Navy vessel. See id. at 22, p. 80. The conflicts raised by this evidence must be resolved by the jury and not by the Court on summary judgment. See Anderson, 477 U.S. at 249. Accordingly, Crane's Motion for Summary Judgment will be denied as it relates to Oneal's claimed exposure to Cranite sheet gaskets.

### III. Conclusion

For the reasons discussed, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant Foster Wheeler Energy Corporation's Motion for Summary Judgment [DE 153] is **GRANTED**;

2. Defendant Crane Co.'s Motion for Summary Judgment [DE 154] is **GRANTED** as it concerns Plaintiff James A. Oneal's alleged exposure to asbestos from Crane valves, but is **DENIED** with respect to Oneal's claimed exposure to Cranite sheet gasket material;

3. Plaintiffs' Request for Hearing of Defendants' Motions for Summary Judgment [DE 163], joined by Defendant Crane Co. [DE 172], is **DENIED**;

4. Foster Wheeler Energy Corporation's Motion in Limine to Prohibit Post-Exposure Evidence to Prove Knowledge or Culpability [DE 199], Motion in Limine Regarding Duty to Warn [DE 200], and Motion in Limine to Prohibit References to Its Financial Worth, to Its Resources to Litigate the Case, and to the Size of Its Defense Team and to Exclude References to Offers of Settlement [DE 201] are **DENIED AS MOOT**;

5. As a result of scheduling conflicts, the October 23, 2014, calendar call is **RESET** for **Wednesday, October 29, 2014, at 3:30 p.m.**; and

6. Defendant Crane Co.'s Request for Hearing [DE 178] on its Motion to Preclude or Limit Causation Testimony from Plaintiffs' Medical Causation Witness Dr. Jerrold Abraham [DE 156] is **GRANTED**.  At the October 29, 2014, calendar call, the Court will hear oral arguments on that Motion, as well as any arguments on the remaining Motions in Limine [DE 190–193, 202–204, 206].

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 19th day of October, 2014.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF